DOUGLAS M. DURBANO [4209]
JOHN E. KEITER [16487]
DURBANO LAW FIRM, P.C.
*Attorneys for Plaintiff*
3103 S. 1730 E.
Salt Lake City, Utah  84106
Telephone: (801) 633-0559
Fax No.: (385) 278-0519
Email: office@durbanolawfirm.com
         john@durbanolawfirm.com

BRUCE R. BAIRD [0176]
2150 S. 1300 E., 5th Floor
Salt Lake City, Utah 84106
Telephone: (801) 328-1400
Email: bbaird@difficultdirt.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH

| | |
|---|---|
| OGDEN REGIONAL AORPORT ASSOCIATION, INC., a Utah Non-Profit Corporation; WENDY MARSELL, individually and on behalf of all those similarly situated, WAYNE LAW, individually and on behalf of all those similarly situated; DURBANO PROPERTIES, L.C., a Utah Limited Liability Company, individually and on behalf of all those similarly situated; and DOES 1-100,<br><br>      Plaintiffs,<br><br>vs.<br><br>OGDEN CITY AIRPORT; and OGDEN CITY, a municipality in the State of Utah.<br><br>      Defendants. | **COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND JUST COMPENSATION**<br><br><br>Civil No. _____<br><br>Judge _____ |

Plaintiffs Wendy Marsell ("**Marsell**"), Wayne Law, and the Ogden Regional Airport Association, Inc. ("**ORAA**"), through their undersigned counsel, Douglas M. Durbano, John E. Keiter and Bruce Baird, hereby submits this Complaint against Ogden Regional Airport ("**Ogden Airport**" or the "**Airport**"), a subdivision of Ogden City ("**Ogden**").

## PARTIES

1. ORAA is a Utah non-profit corporation with its principal place of business in Weber County, State of Utah.

2. Marsell is an individual residing in Weber County, State of Utah.

3. Wayne Law is an individual residing in Weber County, State of Utah.

4. Durbano Properties is a Utah limited liability company with its principal place of business in Layton, Utah.

5. Ogden Airport is a subdivision of Ogden, a municipality in Weber County, State of Utah.

6. Does 1-100 are parties whose true identities are not yet know. Plaintiffs will amend their complaint to reflect the true identities of these parties as they are discovered.

## JURISDICTION AND VENUE

7. This court has jurisdiction in this matter pursuant to Utah Code Ann. § 78A-5-102.

8. Venue is proper in this court pursuant to Utah Code Ann. § 78B-3-307.

## GENERAL ALLEGATIONS

I.   *Introduction.*

1. The ORAA is an association representing the interests of various individuals whose hangars are located at Ogden Airport (the "**Hangar Owner**" or, plurally, "**Hangar Owners**").

2. Ogden Airport is a public aviation facility owned and managed by Ogden, with oversight by the Utah Aeronautical Division.

3. The Airport is not a public service entity, airport authority, or any other special service district.

4. The Airport is part of a national air transportation system and falls under the purview of the United States of America via the regulatory body known as the Federal Aviation Administration (the "**FAA**") pursuant to 49 U.S.C.A. §§ 40101, *et seq.* and applicable federal regulations.

5. The Airport has applied for and received certain FAA grants for the purpose of airport improvements which grants require and impose certain FAA "assurances" upon Ogden as a "public agency sponsor."

6. The assurances include all "general Federal Requirements," all "Executive Orders," and Specific Assurances.

II. *Historical Use.*

7. Throughout the vast majority of its history, the Airport has operated as a general aviation airport.

8. Within the Airport's compound are hundreds of aircraft hangars and tiedowns owned by the Hangar Owners that sit on City owned property.

9. Hangar Owners have ground leases with the Airport.

10. The various lease contracts between the Airport and the Hangar Owners provide for a base monthly lease rate which can be increased based upon rises in the Consumer Price Index.

11. At the end of the lease term, the various leases have historically been renewed without issue and regardless of the Airport's contractual rights relating to lease renewals.

12. The lease renewals have historically been automatic upon the Lease Owner's request.

13. The lease renewals have allowed for hangers to be passed down from generation to generation.

14. The lease agreements provide a right of first refusal provision permitting the Hangar Owner first right to renew the agreement at lease end.

15. The Airport's lessees have placed great stock in being able to reliably and consistently renew their leases with the Airport and Ogden which has given the Hangar Owners confidence in pouring hundreds of thousands of dollars' worth of construction upgrades and upkeep into their respective hangars.

   III.    *The Airport Business Plan.*

16. Just prior to 2019, the Airport proposed adopting the Ogden Airport (OGD) Business Plan (the "**Business Plan**") to govern the Airport's operations and general business functions. *See* **Ex. 1**.

17. Effectively, the Business Plan discusses the Airport's plot to take possession of each and every hangar located within its compound whilst the hangar still has useful life and value, and using the remainder of that hangar's useful life to earn a profit.

18. The Business Plan further discusses the Airport's intent to become the sole fixed based operator ("**FBO**") offering fuel and ground handling at the airport.

19. The Business Plan illustrates the Airport's intent to establish an enterprise:

> The current financial plan is simply not sustainable. Losses from operations and losses (cash flow) on all capital projects, specifically the 9.63% local match for multi-million dollar FAA-AIP grants . . . . Due to the lease methodology, most [Hangar Owners] are just leasing the land directly beneath their hangar.

*Id.* at p. 1.

20. The Business plan lays out the Airport's scheme to obtain additional revenues from the Hangar Owners whose hangars had been substantially improved by the lessees at great expense:

> 3.c.  Address leasing policy. There must be a time set when the hanger is too old to be monopolizing City / Airport land. Policy is essential <u>to support the change from existing policy or past norms, actual or perceived.</u>
>
> 3.d.   The city need[s] the time when the hangar is old enough to revert (30 years) to the City's ownership, but not too old to be able to lease to others without great cost . . . This is a sweet spot between 30-50 years of age. <u>If hangar revert to the City / Airport at 20 or 0 years of age, we can justify capital improvements to the reverted hangars because there is enough useful life left in the asset to make the investment worth the expense . . .</u>

*Id.*

21. Although for months the Airport asserted that the Business Plan was never formally adopted, the Airport's course of dealings with the Hangar Owners demonstrated that the business plan was in fact being utilized as a model for assisting the Airport turn a profit, in substantial part through the Airport's newfound intent to cease lease renewals and invoke, for the first time, the abandonment clause in the lease agreements which had long been waived.

    IV.    <u>Amendment of Ogden City's Title 8</u>

22. On or about April 5, 2021, Ogden's airport manager, Bryant Garrett, submitted proposed amendments (the "**Amendments**") to Title 8 of Ogden City's Municipal Code ("**Title 8**"), which title was incorporated into the Airport's lease agreements with the Hangar Owners.

23. Through Title 8, the Airport Manager sought to establish new parameters to follow when entering into ground leases and facility leases on the airport. *See* Ogden City Council Transmittal, attached hereto at **Ex. 2**.

24. The preface to the Amendments stated that existing airport policy of granting ground leases for a term of 15 years for private hangars, 20 years for commercial aeronautical operators, and 25 years for a fixed based operator. *Id.* at p. 2. The City acknowledges that "the 15/20/25 year lease terms in current city code are insufficient to amortize tenant costs of construction." *Id.* The City admits that the 15/20/25 year lease term limits are arbitrary. *Id.*

25. The City further acknowledged that the FAA recommends a lease term of 30 or 35 years to sufficiently amortize construction costs, and 40 years for more costly projects. *Id.*

26. While the leases between the Airport and Hangar Owners hypothetically allow the Hangar Owners to remove the improvements from the leased grounds, the City understands that "[i]n reality, it is very unlikely that tenants will voluntarily incur the cost of removing existing hangars at the end of term." *Id.*

27. The City's newfound goal is to exploit the reversionary and abandonment clauses in the lease agreements, provisions which have not be enforced for several decades, to replace the ground leases "with facility leases, whereby the city takes ownership of the improvements and tenant pays fair market rent on the improvements and the land." *Id.*

28. "Facility leases are different from ground leases in that the city owns the improvements on the leased premises, rather than the tenant. Facility leases require payment of fair market rent on both improvements and land." *Id.* at p. 3.

29. The City knows that their course of performance in consistently renewing ground leases has caused several Hangar Owners to invest hundreds of thousands or even millions of dollars into their Hangars.

30. The City knows that Hangar Owners cannot amortize the costs of their improvements over the arbitrary 15/20/25-year lease terms.

31. Through its prior course of dealings with the Hangar Owners, the City has intentionally instilled a reliance that the ground leases would consistently be renewed to encourage Hangar Owners to invest hundreds of thousands of dollars into their hangars so that the City could obtain ownership of the improved hangars for facility leases prior to the Hangar Owners seeing any significant return or realizing the full benefit of the leasehold improvements.

32. On April 20, 2021, the City Council voted and adopted the amendments to Title 8 of the City Code over the objections of several hangar owners.

V. *Using TSA Security Badges to Penalize Leaseholders*.

33. The United States Transportation Security Administration (TSA) requires that airports, including the Ogden Airport, adopt and carry out a security program to provide for the safety and security of persons and property on an aircraft operating in air transportation. 29 C.F.R. § 1542.101.

34. Included in these regulations is the requirements for airports to adopt a Tenant Security Program to ensure that airport tenants assume responsibility for specified security measures of the airport's secured area. *Id.* at § 1542.113.

35. Ogden Airport utilizes security badges as an integral part of its Tenant Security Program and requires all tenants to apply for and receive a badge to obtain access to airport property as required by TSA.

36. Pursuant to the Civil Aviation Security regulations promulgated by TSA, "[n]o person may . . . [u]se, allow to be used, or cause to be used, any airport-issued or airport-approved access medium or identification medium that authorizes the access, presence, or movement of persons or vehicles in secured areas . . . in any other manner than that for which it was issued . . . ." *Id.* at § 1540.105.

37. Notwithstanding the foregoing, the Airport has consistently used the security badges it issues under its Tenant Security Program to be used for purposes other than as provided for by the TSA, including, and especially, to penalize, coerce or retaliate against its ground lessors for matters unrelated to security.

## FIRST CAUSE OF ACTION
### (Estoppel)

38. Plaintiffs incorporate the preceding paragraphs as though fully restated herein.

39. Estoppel applies to prevent one party from deluding or inducing another into a position where it will unjustly suffer loss. *J.P. Kock, Inc. v. J.C. Penney Co., Inc.*, 534 P.2d 903, 905 (Utah 1975).

40. Estoppel arises where one by its conduct, lulls another into false security and into a position he would not take only because of such conduct. *Buxton v. Diversified Resources Corp.* 634 F.2d 1313, 1318 (10th Cir. 1980).

41. For decades, the Defendants have lulled Plaintiffs into a sense of ownership and security in their hangars, causing Hangar Owners to invest hundreds of thousands of dollars into

their respective hangars and invoking in the Hangar Owners a sense of lifetime ownership of their respective hangars, through the City's historic practice of consistently and reliably renewing airport leases.

42. Defendants know that the Hangar Owners cannot realize a return on the investment within their hangar properties under an arbitrary 15/20/25-year lease term.

43. Defendants repudiation or denial of their historical treatment of lease renewals has been detrimental to the Hangar Owners' property rights and resulted in damages to them by way of not receiving the benefit of the hangar improvements prior to the City's taking of the hangar property.

**SECOND CAUSE OF ACTION**
**(Fifth and Fourteenth Amendments – 42 U.S.C. § 1983)**
**(Physical Taking without Just Compensation)**

44. Plaintiffs incorporate the preceding paragraphs as though fully restated herein.

45. The Fifth Amendment to the Constitution of the United States provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V.

46. The Fifth Amendment's prohibition on taking private property for public use without just compensation applies to the States through the Fourteenth Amendment to the Constitution of the United States.

47. The Airport's Business Plan lays out its scheme and intent to take possession of each and every hangar located within its compound whilst the hangar still has useful life and value in order to turn a profit thereon through facility lease agreements.

48. The Airport's historical course of conduct instilled in Hangar Owners a sense of security and lifetime ownership of their hangars, causing Hangar Owners to invest hundreds of

thousands of dollars' worth of improvements into their hangars, and extending the useful life thereof.

49. The Airport's 15/20/25-year lease term is arbitrary, capricious and does not afford Hangar Owners any opportunity to realize a return on their hangar investments.

50. The Airport's business plan and the amendments to Title 8 requires Hangar Owners to surrender their personal property to the City at the end of the lease term, a requirement which runs contrary to the historical performance required under the various lease agreements. Such an evisceration of property rights is a taking and requires just compensation.

51. Taken together, the Business Plan and Title 8 effect a physical taking by depriving Plaintiffs of their personal property rights, including the significant improvements installed at the various hangars, and deprives the Hangar Owners of core property rights including the right to exclude others from their hangars, the right to possess and use their hangars for their own enjoyment, and the right to dispose of their property as they see fit.

52. The Business Plan and Title 8 do not provide plaintiffs with just compensation for these takings.

53. Absent declaratory relief, just compensation, or injunctive relief, Plaintiffs will suffer irreparable harm caused by a deprivation of their constitutional rights.

### THIRD CAUSE OF ACTION
**(Fifth and Fourteenth Amendments – 42 U.S.C. § 1983)**
**(Regulatory Taking Without Just Compensation)**

54. Plaintiffs incorporate the preceding paragraphs as though fully restated herein.

55. Title 8 of the City Code, as amended, constitutes a statutory enactment of the Business Plan and is a regulatory taking, inflicting an uncompensated taking by denying property owners, including Plaintiffs, of an economically viable use of their hangars.

56. Title 8 and the Business Plan inflicts a regulatory taking because it imposes a severe burden on private property rights.

57. Title 8 exploits the reversionary and abandonment clauses in the lease agreements, provisions which have not been enforced for decades, to replace ground leases with facility leases, allowing the city to take ownership of the hangar improvements and requiring the Hangar Owners to pay fair market rent on the hangars and land.

58. The City's action under Title 8 and the Business Plan is functionally equivalent to a direct appropriation of private property. In effect, it converts the hangars it governs, on a permanent basis, into public property used to turn a profit against the hangar owners.

59. Absent declaratory relief, just compensation, or injunctive relief, Plaintiffs will suffer irreparable harm caused by deprivation of their constitutional rights.

**FOURTH CAUSE OF ACTION**
**(Unauthorized Deprivation of Airport Access – 42 U.S.C. § 1983)**

60. Plaintiffs incorporate the preceding paragraphs as though fully restated herein.

61. The Hangar Owners have lawfully applied for and received security badges under the Airport's Tenant Security Program in compliance with the regulations set forth by TSA.

62. Defendants have unlawfully deprived Plaintiffs of the use of their security badges and access to airport property for reasons unrelated to the security measures set forth by TSA.

63. Defendants deprivation of Plaintiffs' right to lawfully use their security badges constitutes a violation under 42 U.S.C. § 1983, entitling Plaintiffs to an award of damages.

**FIFTH CAUSE OF ACTION**
**(Declaratory Relief – 28 U.S.C. § 2201)**

64. Plaintiffs incorporate the preceding paragraphs as though fully restated herein.

65. Plaintiffs and Defendants have an actual controversy, thus invoking the authority of this court to enter declaratory relief.

66. Plaintiffs are entitled to a Declaratory Judgment finding that:

    a. Defendants have waived their rights under the Lease Agreement;

    b. Defendants' conduct has created a reliance of interest in Plaintiffs which, if Defendants are permitted to alter their course of conduct, would cause damage to Plaintiffs;

    c. Defendants' conduct constitutes a taking of personal property, entitling Plaintiffs to just compensation;

    d. Defendant's conduct with respect to management of security badges at the airport is unlawful and has deprived Plaintiffs of access to their property and other personal rights;

    e. Such other declaratory relief the Court deems proper.

## ***ENTITLEMENT TO INJUNCTIVE RELIEF***

67. Defendants conduct amounts to waiver, estoppel, unconstitutional taking of private property, and a deprivation of rights, which causes irreparable harm to Plaintiffs.

68. Defendants' conduct is ongoing and will continue to cause irreparable harm to Plaintiff unless and until an injunction is entered by the Court.

69. The continual injury to Plaintiffs to Plaintiffs outweighs any damage to Defendants that could be caused by an injunction.

70. The injunction is not adverse to the public interest, rather it is in favor of the public interest because Defendants are knowingly depriving the rights of its own citizens at large.

71. Wherefore, the Court should enter injunctive relief against Defendats requiring that Defendants cease their unlawful takings, enforcement of unlawful contractual clauses, and unlawful use of security badges.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask this Court to enter judgment in Plaintiffs' favor and against Defendants to:

A. Apply the doctrine of estoppel against the City's denial of their historical treatment of lease renewals;

B. Declare that the Business Plan and Title 8, as amended, violate the Takings Clause of the Fifth Amendment of the United States Constitution, both facially and as applied to Plaintiffs;

C. Declare that the Business Plan and Title 8, as amended, violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

D. Declare the Defendants' use of security badges for non-security purposes as illegal and a deprivation of Plaintiffs' rights;

E. Permanently enjoin Defendants from enforcing or exercising any authority under the Business Plan or the amended provisions of Title 8;

F. Permanently enjoin Defendants from using security badges for non-security purposes;

G. Award just compensation for Defendants' taking of Plaintiffs' property in violation of the Fifth Amendment;

H. Award damages or restitution for Defendants' violation of Plaintiffs' rights in using security badges for non-security related purposes;

I. Award prejudgment interest at the maximum rate allowed by law;

J. Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

K. Award any other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: May 24, 2021.

DURBANO LAW FIRM, P.C.

 */s/ John E. Keiter*
JOHN E. KEITER
*Attorneys for Plaintiff*