## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| OGDEN REGIONAL AIRPORT ASSOCIATION, INC., *et al.*, individually and on behalf of similarly situated individuals,<br><br>     Plaintiffs,<br><br>v.<br><br>OGDEN CITY AIRPORT, OGDEN CITY, and BRYANT GARRETT, in his capacity as manager of the Ogden City Airport,<br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [61] DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 1:21-cv-00075-DBB-DBP<br><br>District Judge David Barlow<br><br>Magistrate Judge Dustin B. Pead |

This case is before the court on Defendants' motion to dismiss Plaintiffs' second amended class action complaint[1] under Federal Rule of Civil Procedure 12(b)(6).[2] Plaintiffs have filed a response opposing the motion,[3] and Defendants have replied.[4] Because Plaintiffs have failed to state a claim for which relief can be granted under federal law, and the court declines to maintain supplemental jurisdiction over Plaintiffs' remaining state law claims, Defendants' motion to dismiss is GRANTED.

---

[1] ECF No. 57, filed February 14, 2022.

[2] ECF No. 61, filed March 11, 2022. Defendants also move for dismissal under Rule 12(b)(1), but they made no argument whatsoever in their briefs as to why the court lacks jurisdiction. Therefore, the court will consider it a motion to dismiss under Rule 12(b)(6) only.

[3] ECF No. 64, filed March 31, 2022.

[4] ECF No. 82, filed May 6, 2022. The court concludes that oral argument is not necessary to resolve the motion to dismiss. *See* DUCivR 7-1(g).

# BACKGROUND

Plaintiffs are individuals and entities who own or have owned aircraft hangars on ground leased from Defendant Ogden City Airport (the Airport), "a public aviation facility owned and managed by" Defendant Ogden City (the City), a municipality in Weber County, Utah.[5] Some of these hangars have been passed from generation to generation within families.[6] Some have even been put into family trusts.[7]

Plaintiffs' ownership and use of their hangars at the Airport are governed by ground lease agreements with Defendants (the Agreements).[8] All the Agreements contain the following provision, or something virtually identical to it, requiring compliance with certain city ordinances:

> Lessee hereby acknowledges the applicability of Title 8, Ogden City Ordinances to this Lease Agreement. Lessee hereby acknowledges notice of the terms, conditions and requirements presently contained therein and agrees, so far as said ordinance applies to persons such as Lessee herein, to comply with such ordinance as now in effect or as it may be amended during the term of this Lease or any renewal. **Specifically, the terms and conditions of Title 8-3-3 (A through G) Leases and Agreements as currently existing or as may be amended are incorporated herein by reference and made part hereof as though written herein.**[9]

---

[5] ECF No. 57 ¶¶ 1–67, 79, 81. In reviewing Defendants' motion to dismiss, the court must "accept all well-pleaded factual allegations in the complaint as true, and . . . view them in the light most favorable to [Plaintiffs]." *Ashaheed v. Currington*, 7 F.4th 1236, 1249 (10th Cir. 2021) (quoting *Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021)).

[6] *Id.* ¶ 95.

[7] *Id.*

[8] *Id.* ¶ 88.

[9] *Id.* ¶ 93.

Until recently, Title 8-3-3 of the Ogden City Code allowed the Airport to grant ground leases for private hangars for a term of 15 years.[10] It also contained the following provision regarding the renewal of leases:

> Upon lease expiration, lessee shall have the 'first right of refusal' to renew their lease; provided however, that the lease is not in default. Each renewal term will be for five (5) years.[11]

Most of the Agreements also contain a "first right of refusal" provision that is separate and independent from the one incorporated with Title 8.[12]

Historically, the Airport has always renewed ground leases upon a lessee's request.[13] Indeed, according to the Airport's manager from 2001 to 2010, it was the Airport's "practice and policy . . . to freely allow owners to renew their [ground] leases."[14] Because of the consistency and reliability with which ground leases were renewed, Plaintiffs and other lessees have invested hundreds of thousands or even millions of dollars to build, maintain, and upgrade their hangars.[15]

At the end of 2018, the Airport proposed adopting a new business plan to improve its profitability, as it was operating at a loss.[16] As one way to increase its revenue, the Airport proposed two main modifications to its leasing policies.[17] First, all future ground leases for construction of new hangars would last no longer than a period of time sufficient to allow lessees to amortize the costs of construction, after which the hangars would belong to the Airport and be

---

[10] *Id.* ¶ 92.

[11] *Id.*

[12] *Id.* ¶ 94.

[13] *Id.* ¶¶ 90–91.

[14] *Id.* ¶ 98.

[15] *Id.* ¶¶ 96–97.

[16] *Id.* ¶¶ 100–01. The proposed business plan was attached to the second amended complaint. *See* ECF No. 57-5.

[17] ECF No. 57 ¶ 104.

leased out through facility leases at a higher rate.[18] And second, all ground leases for existing hangars would not be renewed once the hangars reached a certain age.[19] Such hangars, if not removed,[20] would belong to the airport and be leased out by the Airport at a higher rate through facility leases or destroyed to make room for newly constructed hangars.[21]

Although the business plan was not formally adopted at that time, the Airport's subsequent interactions with hangar owners evinced that it was beginning to follow the plan's proposals.[22] Additionally, on or about April 5, 2021, the Airport's manager, Defendant Bryant Garrett, proposed amendments to Title 8 that would essentially effectuate the business plan's proposals with regard to ground leases.[23] Over objections from the Airport's advisory board, the Ogden Regional Airport Association, and the majority of hangar owners, the Ogden City Council adopted the amendments to Title 8 on April 20, 2021.[24] Among the changes to Title 8 were the removal of its "first right of refusal to renew" provision and designated yearly rate increases for ground leases.[25]

Approximately one month after Title 8 was amended, Plaintiffs commenced this action against the Airport and City.[26] On June 15, 2021, Plaintiffs filed an amended class action complaint seeking declaratory, injunctive, and monetary relief on grounds of promissory

---

[18] *Id.*; *see also* ECF No. 57-5 at 6.

[19] ECF Nos. 57 ¶¶ 104–05; 57-5 at 6–8.

[20] The Agreements allow lessees to remove hangars and other improvements from the leased land upon expiration. ECF Nos. 57 ¶ 110; 57-5 at 6. However, if hangars are not removed within 60 days of the lease's expiration, they apparently become the property of the Airport pursuant to an abandonment clause in the Agreements. ECF Nos. 57 ¶ 105; 57-2 at 6, 29, 52, 118.

[21] ECF Nos. 57 ¶ 105; 57-2 at 6, 29, 52, 118.

[22] ECF No. 57 ¶ 105.

[23] *Id.* ¶¶ 106–14.

[24] *Id.* ¶ 118.

[25] *Id.* ¶¶ 119–23.

[26] *See* ECF No. 2.

estoppel, physical taking, regulatory taking, and deprivation of rights under 42 U.S.C. § 1983.[27]

Plaintiffs claimed that they had or were likely to suffer harm because the amendments to Title 8

allow the Airport and City to seize ownership of Plaintiffs' hangars when their lease term expires

without providing just compensation.[28] Plaintiffs also claimed that they had relied on the

Airport's consistent and reliable renewals of their ground leases, amounting to hundreds of

thousands of dollars invested in their hangars, such that they would suffer immense harm if the

Airport and City are not enjoined from changing their historical practice.[29]

 The Airport and City moved to dismiss Plaintiffs' first amended complaint on August 23,

2021.[30] They argued that dismissal was warranted under Federal Rule of Civil Procedure

12(b)(1) because the court lacked jurisdiction over Plaintiffs' proposed class action under the

Class Action Fairness Act of 2005 (CAFA).[31] They also argued that even if CAFA did not bar

Plaintiffs' proposed class action, dismissal was warranted under Rule 12(b)(6) because Plaintiffs

had failed to state a claim for which relief could be granted.[32]

 On January 11, 2022, the court granted the motion to dismiss in part and denied it in

part.[33] The court denied the Airport's and City's motion to dismiss for lack of jurisdiction

because CAFA's limitations on jurisdiction apply only to diversity jurisdiction, and Plaintiffs had

invoked the court's federal question jurisdiction.[34] However, the court agreed that Plaintiffs had

---

[27] *See* ECF No. 7.

[28] *Id.* at 16.

[29] *Id.* at 17. Plaintiffs also claimed that they were entitled to damages for the Airport's "unlawful deprivation of airport access" pursuant to 42 U.S.C. § 1983 and declaratory relief pursuant to their Agreements. *Id.* at 21–22.

[30] ECF No. 11.

[31] *Id.* at 5–11.

[32] *Id.* at 11–26.

[33] *See* ECF No. 46.

[34] *Id.* at 7–8.

failed to state a claim for promissory estoppel, a physical and regulatory taking, and a § 1983 violation.[35] And because Plaintiffs' remaining declaratory judgment claims were based on state law, the court declined to exercise jurisdiction over them.[36] Accordingly, the court granted the Airport's and City's motion to dismiss and instructed Plaintiffs that they could seek leave to amend their complaint.[37]

On February 14, 2022, Plaintiffs filed their second amended class action complaint.[38] They again assert claims of promissory estoppel, physical taking, regulatory taking, and entitlement to declaratory relief.[39] However, they have now added claims of First Amendment retaliation, breach of contract, and breach of the covenant of good faith and fair dealing.[40] They have also added Bryant Garrett as a § 1983 defendant.[41]

Defendants moved to dismiss Plaintiffs' second amended complaint March 11, 2022.[42] They again argue that Plaintiffs' case should be dismissed under Rule 12(b)(6) for failure to state a claim for which relief can be granted.[43] Plaintiffs filed a response opposing the motion on March 31, 2022, and Defendants replied on May 6, 2022.[44]

---

[35] *Id.* at 8–22.

[36] *Id.* at 22–23.

[37] *Id.* at 24–25.

[38] ECF No. 57.

[39] *Id.* at 26–31, 34–35.

[40] *Id.* at 31–34.

[41] *Id.* at 35–36.

[42] ECF No. 61.

[43] *Id.* at 1.

[44] ECF Nos. 64, 82.

**LEGAL STANDARD**

Under Rule 12(b)(6), dismissal is required when the complaint, standing alone, is insufficient to state a claim upon which relief may be granted.[45] To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[46] Generally, to be facially plausible, each claim must be supported by well-pleaded facts allowing the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[47] There must be "more than a sheer possibility that a defendant has acted unlawfully."[48] A claim supported only by "labels and conclusions," "a formulaic recitation of the elements," or "naked assertions devoid of further factual enhancement" is deficient and subject to dismissal.[49] In assessing whether a claim is plausible, courts must "draw on [their] judicial experience and common sense."[50]

**DISCUSSION**

Plaintiffs invoke federal question jurisdiction by asserting a mix of federal and state law claims, so the court begins with determining whether Plaintiffs have stated a plausible claim under federal law. Because the court ultimately finds that they have not, which results in the dismissal of all claims over which the court has original jurisdiction, the court declines to exercise jurisdiction over Plaintiffs' remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3) and therefore dismisses them without determining their plausibility.

---

[45] *See Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.").

[46] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[47] *Id.*

[48] *Id.*

[49] *Id.* (citations, brackets, and internal quotation marks omitted).

[50] *Id.* at 679.

I.      **Plaintiffs Have Failed to State a Claim for which Relief Can Be Granted under Federal Law.**

Plaintiffs' federal claims are brought under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201.

Section 1983 provides a cause of action for individuals who have been deprived of federal rights by state action.[51] A municipality or local government entity, like the City and Airport, can be held liable under § 1983 if it "'subjects' a person to a deprivation of rights or 'causes' a person to be subjected' to such deprivation."[52] To state such a claim, a plaintiff must plausibly allege that (1) the municipality "executed a policy or custom" that (2) "caused the plaintiff to suffer deprivation of constitutional or other federal rights."[53] Section 1983 claims can also be brought against individuals who are agents of the state, like Garrett.[54] However, because Plaintiffs bring a § 1983 against Garrett in his official capacity as manager of the Airport, it is simply another way of stating a claim against the Airport and City.[55]

---

[51] 42 U.S.C. § 1983; *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019).

[52] *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978)); *see also Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009) ("Municipal entities and local governing bodies are not entitled to the traditional common law immunities for § 1983 claims.").

[53] *Moss*, 559 F.3d at 1168. Municipal policies and customs include:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

[54] *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.").

[55] *Id.* ("Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'").

8

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party."[56]  The Act thus allows federal courts to provide relief to plaintiffs by recognizing their rights, even if they do not seek to immediately enforce them.[57] However, it is important to remember that "[t]he operation of the Declaratory Judgment Act is procedural only," meaning that even though it "enlarged the ranges of remedies available in the federal courts," it "did not extend their jurisdiction."[58] Thus, the court does not have "power to issue declaratory judgments" unless there is "some independent basis of jurisdiction" for doing so, namely diversity jurisdiction or federal question jurisdiction.[59]

Plaintiffs assert three main claims under § 1983 and the Declaratory Judgment Act: physical taking without just compensation in violation of the Fifth and Fourteenth Amendments, regulatory taking without just compensation in violation of the Fifth and Fourteenth Amendments, and First Amendment retaliation.[60] The court will consider the plausibility of these claims in turn.

### A.  Physical and Regulatory Takings under the Fifth Amendment

The Fifth Amendment provides "nor shall private property be taken for public use, without just compensation."[61] This provision was "designed to bar Government from forcing

---

[56] 28 U.S.C. § 2201.

[57] *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Before the Act, "a federal court would entertain a suit on a contract only if the plaintiff asked for an immediately enforceable remedy like money damages or an injunction." *Id.*

[58] *Id.* (quoting *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937)).

[59] *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 964 (10th Cir. 1996).

[60] Plaintiffs seek a declaratory judgment that Defendants engaged in these violations in addition to any relief provided for the violations under § 1983 itself. *See* ECF No. 57 at 35–36.

[61] U.S. Const. Amend. V. Of course, the Fifth Amendment's taking clause applies to the states through the Fourteenth Amendment. *See Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 236 (1897).

some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."[62] Courts have recognized two main categories of takings for purposes of the Fifth Amendment: physical takings and regulatory takings.

A physical taking occurs whenever "the government physically takes possession of an interest in property for some public purpose."[63] While the property interest at the heart of taking claims is typically real or personal property, the Fifth Amendment's protections also extend to many "intangible rights, such as leaseholds, liens, and contracts."[64] However, when rights related to a contract with the government are at issue, taking claims are rarely appropriate "because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity."[65] Indeed, "it is well established that a plaintiff who is suing in connection with a government contract 'is entitled to a takings remedy only if it is foreclosed from bringing a breach of contract action, *i.e.*, if its contract rights have been 'taken.'"[66] Thus, when rights related to a contract with a government are in dispute, "interference with [those] rights generally gives rise to a breach claim not a taking claim."[67]

---

[62] *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123 (1978) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

[63] *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) ("The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property.").

[64] *See Aviation & Gen. Ins. Co., Ltd. v. United States*, 121 Fed. Cl. 357, 362 (2015) (citing *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945); *Armstrong v. United States*, 364 U.S. 40, 44 (1960); and *Lynch v. United States*, 292 U.S. 571, 579 (1934)).

[65] *Hughes Comm'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001).

[66] *Cross Continent Dev., LLC v. Town of Akron*, 742 F. Supp. 2d 1182, 1184 (D. Colo. 2010) (quoting *Pi Elecs. Corp. v. United States*, 55 Fed. Cl. 279, 285 (2003)).

[67] *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978) (citation omitted).

In contrast, a regulatory taking occurs when the government issues "regulations prohibiting private uses" rather than when it acquires or invades "property for public use."[68] A regulatory taking is considered a *per se* taking in "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted" due to government regulation.[69] "Anything less than a complete elimination of value, or a total loss," from government regulation must be analyzed under the framework set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).[70] "The major factors under the [*Penn Central*] inquiry are (1) '[t]he economic impact of the regulation on the claimant,' (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations,' and (3) 'the character of the governmental action.'"[71] A plaintiff seeking to establish a regulatory taking has a "heavy burden."[72]

Plaintiffs argue that the City's amendments to Title 8 effect both a physical and regulatory taking for which the City refuses to provide just compensation. The court addresses each claim in turn.

### 1. Plaintiffs Have Failed to State a Plausible Physical Taking Claim.

Plaintiffs argue that the amendments to Title 8 constitute a physical taking because they took away some of Plaintiffs' contractual rights.[73] Specifically, Plaintiffs argue that the

---

[68] *Tahoe-Sierra*, 535 U.S. at 323; *see also Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (noting that a regulatory taking occurs "[w]hen the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property"); *Blundell v. Elliott*, No. 1:20-cv-00143-RJS-DBP, 2021WL 4473426, at *7 (D. Utah Sept. 30, 2021) (noting that regulatory takings "stem from government-imposed regulations restricting an owner's ability to use his own property").

[69] *Tahoe-Sierra*, 535 U.S. at 330.

[70] *Id.*

[71] *Ramsey Winch, Inc. v. Henry*, 555 F.3d 1199, 1210 (10th Cir. 2009) (quoting *Penn Central*, 438 U.S. at 124).

[72] *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006).

[73] ECF No. 57 at 27–29.

amendments unilaterally enacted rate increases and took away the "first right of refusal to renew" provision incorporated into the Agreements by prior versions of Title 8.[74] Plaintiffs also argue that although contractual rights under their Agreements are at issue here, a taking claim is nonetheless appropriate because a breach of contract has been foreclosed by the taking of their contractual rights.[75]

There is no dispute that Plaintiffs' ground lease agreements with the Airport do not impede, and indeed specifically envision, amendments to Title 8. Each Agreement states that the terms and conditions of Title 8 "as currently existing *or as may be amended* are incorporated herein by reference and made part hereof as though written herein."[76] The issue here is whether the amendments the City enacted, and their effect on the Agreements upon incorporation, constitute a taking of Plaintiffs' contractual rights.

Based on the allegations in the amended complaint, Plaintiffs have failed to state a plausible physical taking claim against Defendants. Instead, the allegations evince that any cause of action Plaintiffs may have against Defendants sounds in contract, and the possible availability of contract-based claims precludes the assertion of a taking claim under the Fifth Amendment.[77]

Plaintiffs first argue that the amended Title 8 effectuates a taking because it establishes a lease rate increase beyond the Consumer-Price-Index-adjusted rates established by Plaintiffs' Agreements. However, whether Plaintiffs are bound by this additional rate increase is a contractual issue. Whether the Agreements' provision incorporating Title 8 "as currently existing or as may be amended" allows Defendants to change the material terms of the Agreements, such

---

[74] *Id.*

[75] *Id.* at 29.

[76] ECF No. 57 ¶ 93 (emphasis added).

[77] *See Hughes*, 271 F.3d at 1070.

as lease rates, is a question of contractual interpretation. If the incorporation provision allows Defendants to alter any material term of the Agreements by amending Title 8, Plaintiffs have no claim to relief. However, if that provision does not allow amendments to Title 8 to alter the Agreements' other previously agreed-upon terms and conditions, Plaintiffs may seek contract-based relief if Defendants attempt to enforce terms or conditions that directly conflict with those previously agreed upon. The gist of Plaintiffs' allegations here is the latter: that the amended Title 8, if enforced, breaches the terms of their Agreements. Thus, any relief for Plaintiffs on this issue arises from their Agreements, not federal constitutional rights.

The same is true of Plaintiffs' second argument, that the amended Title 8 effectuates a taking because it eliminated the "first right of refusal" provision incorporated into the Agreements by prior versions of Title 8. The court first notes that for most Plaintiffs here this is largely a moot issue. Their Agreements contain a "first right of refusal" provision that is virtually identical to, but separate and independent from, the one incorporated with Title 8, and neither party has claimed that the removal of the "first right of refusal" provision from Title 8 has any impact on that separate "first right of refusal" provision. For these Plaintiffs, the "first right of refusal" provided by previous versions of Title 8 was redundant, and no right was actually taken from them when Title 8 was amended.

However, even for Plaintiffs who possessed a "first right of refusal" only through the incorporation of previous versions of Title 8, whether the elimination of that right entitles them to relief is a contractual issue.[78] The issue is whether the Agreements' incorporation provision

---

[78] Plaintiffs place great emphasis on their "first right of refusal" in their factual averments and arguments. However, they make no specific claims as to what that right actually entailed. Notably, they have made no direct claim that the "first right of refusal" provision constituted some type of guarantee or contractual right to a lease renewal. Instead, their argument is primarily that it is "Defendants' historical application of the First Right of Refusal," combined with the removal of that right by the amendments, that gives rise to a physical taking claim. ECF No. 57 ¶¶ 172–74. At most, they appear to imply that the "first right of refusal" provision gave them some type of right to lease renewals by arguing the amended Title 8 "altered the Hangar Owners' contractual rights" by providing that a renewal of

allows and incorporates amendments to Title 8 that eliminate or contradict contractual rights that were incorporated with Title 8 at the time the Agreements were formed. If the incorporation of such amendments is contractually permitted, the previously incorporated rights were taken by contractual action, not government action, and Plaintiffs have no basis to enforce them. If it does not, any failure by Defendants to honor the previously incorporated rights would give rise to "nothing more than a garden variety contract dispute."[79]

In sum, Plaintiffs' allegations show, at most, that the amendments to Title 8 give rise to a cause of action against Defendants sounding in contract. Whether they do requires interpreting the parties' Agreements. Because nothing impedes Plaintiffs from seeking declaratory relief regarding the meaning of their Agreements or asserting other claims sounding in contract— indeed, they have done just that in this case[80]—they have no plausible basis for asserting a physical taking claim.[81] Accordingly, Plaintiffs' physical taking claim must be dismissed.

### 2. Plaintiffs Have Failed to State a Regulatory Taking Claim.

Plaintiffs next argue that the amendments to Title 8 effectuated a regulatory taking of their hangars because they have significantly interfered with Plaintiffs' investment-backed expectations therein.[82] They claim that they have suffered and will continue to suffer harm

---

ground leases "may" be granted. *Id.* ¶ 174. Predictably, Defendants disagree with this interpretation of the provision. ECF No. 82 at 6. Because determining the meaning of the "first right of refusal" provision would require interpreting Plaintiffs' Agreements, and the court ultimately decides to refrain from considering Plaintiffs' contract-based claims under state law, there is no need to resolve this dispute.

[79] *See Janicki Logging Co., Inc. v. United States*, 36 Fed. Cl. 338, 346 (1996).

[80] Plaintiffs assert promissory estoppel, breach of contract, breach of the covenant of good faith and fair dealing, and various contractual grounds for declaratory relief. *See* ECF No. 57 at 32–36.

[81] *See Pi Elecs.*, 55 Fed. Cl. at 285.

[82] ECF No. 57 at 29–31.

because the amendments deny them "of an economically viable use of their hangars" by reducing the value thereof, particularly when their lease terms end.[83]

However, these allegations are insufficient to state a plausible regulatory taking claim. Plaintiffs have failed to state a *per se* regulatory taking claim because they have not plausibly alleged that the amendments to Title 8 destroy all productive or economically beneficial use of their hangars. Plaintiffs' property interest in their hangars on the Airport's land arises from, and is governed by, their Agreements with the Airport. And it appears that the amended Title 8 does not "interfere in any way with the present uses of" Plaintiffs' hangars under those Agreements.[84] It has no effect on Plaintiffs' right to possess, exclude people from, derive income from, sell, demolish, or remove them, as long as those Agreements remain in effect.

Plaintiffs' argument that the amendments to Title 8 effectuate a regulatory taking under the *Penn Central* factors because they interfere with Plaintiffs' investment-backed expectations is also unavailing.[85] The primary focus of the *Penn Central* inquiry is "the extent of [a] regulation's interference with property rights" and the "economic impact" of that interference.[86] Although Plaintiffs have alleged much about how Defendants' decision to cease renewing ground leases adversely impacts them economically, Plaintiffs have completely failed to identify any property rights in their hangars with which the amendments to Title 8 interfered. It is Defendants' decision not to renew certain ground leases that jeopardizes Plaintiffs' ownership and use of the hangars sitting on that ground, and Plaintiffs have failed to provide any basis for concluding that Defendants could not have taken this course of action without the amendments to Title 8.

---

[83] *Id.*

[84] *See Penn Central*, 438 U.S. at 136.

[85] ECF No. 57 at 29–31.

[86] *Alto Eldorado P'ship v. Cnty. of Santa Fe*, 634 F.3d 1170, 1174 (10th Cir. 2011).

Plaintiffs have failed to adequately explain how the amendments to Title 8 caused the harm they allege for the same reasons. The fact that economic harm follows a regulation does not on its own establish a causal connection between that regulation and the alleged harm. Yet that is all that Plaintiffs have alleged here.

In sum, to state a regulatory taking claim, Plaintiffs must plausibly allege that the amendments to Title 8 interfered with a property right and that this interference caused economic harm. Plaintiffs have simply failed to do that. And without having identified a property right that has been interfered with, Plaintiffs' claim that Defendants infringed on the investment-backed expectations arising from their reliance on Defendants' historical practices is nothing more than a promissory estoppel claim dressed in the garb of a regulatory taking claim. Accordingly, Plaintiffs' regulatory taking claim must be dismissed.

### B. First Amendment Retaliation

Plaintiffs' final federal claim is for First Amendment retaliation.[87] To state a First Amendment retaliation claim, a plaintiff must plausibly allege "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."[88]

Plaintiffs contend that Defendants are retaliating against them for bringing this lawsuit by refusing to renew the lease of any individual participating in it.[89] Plaintiffs also contend that this

---

[87] ECF No. 57 at 31–32.

[88] *Requena v. Roberts*, 893 F.3d 1195, 1211 (10th Cir. 2018) (quoting *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007)).

[89] *Id.*

has had, and will continue to have, a chilling effect on hangar owners who wish to vindicate their rights in this lawsuit.[90] To support these allegations, Plaintiffs cite an email to a Plaintiff from the Airport's manager, Garrett, in which he stated, "You can seek the possibility of a new lease through the Airport, or you can choose to join litigation against the City to seek something different through the courts."[91] They also note that at least one Plaintiff has withdrawn from this lawsuit after being given the opportunity to sign a new lease with the Airport if he withdrew from the lawsuit.[92]

There is no dispute that Plaintiffs' commencement of this lawsuit against the City and the Airport is a constitutionally protected activity under the petitioning clause of the First Amendment.[93] However, because Plaintiffs have failed to plausibly allege the other two elements of a retaliation claim, their claim must be dismissed.

For starters, Plaintiffs have failed to plausibly allege that Defendants engaged in any adverse action against Plaintiffs *as a response* to Plaintiffs' exercising their First Amendment rights by bringing this lawsuit. The act Plaintiffs allege is retaliatory—Defendants' refusal to renew ground leases like they have in the past—is precisely what led Plaintiffs to file this lawsuit in the first place.[94] It is clear from the allegations of Plaintiffs' complaint that they brought this lawsuit because Defendants expressed their intent to cease renewing ground leases in favor of

---

[90] *Id.*

[91] *Id.* ¶ 147.

[92] *Id.* ¶ 148.

[93] *See Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011) ("[T]he Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."); *see also Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007) ("[A] private citizen exercises a constitutionally protected First Amendment right *anytime* he or she petitions the government for redress; the petitioning clause of the First Amendment does not pick and choose its causes. The minor and questionable, along with the mighty and consequential, are all embraced.").

[94] *See id.* ¶ 112.

granting new facility and construction leases, not the other way around.[95] In other words, the

City's decision not to continue routinely and perpetually renewing leases caused the lawsuit, not

the other way around. The fact that the Airport allegedly told certain plaintiffs *after* the

commencement of this lawsuit that no one who is participating in it will receive a lease renewal

does not change the fact that the decision to stop renewing ground leases in favor of other types

of leases was made before this lawsuit began. Thus, there are no grounds for the court to

reasonably infer that Defendants' refusal to renew any of Plaintiffs' ground leases, and any injury

that may have caused, was substantially motivated by Plaintiffs' lawsuit.

However, even if that were not the case, Plaintiffs have failed to plausibly allege that

Defendants' actions would chill a person of ordinary firmness from continuing to exercise First

Amendment rights here, i.e., from continuing to participate in this lawsuit. For one thing,

Plaintiffs' allegation that Defendants' actions have a chilling effect makes little sense here. As

just discussed, the action that Plaintiffs now allege was retaliatory and chilling—Defendants'

refusal to renew their ground leases—is the same action that led Plaintiffs to bring this lawsuit in

the first place. Plaintiffs have not identified, nor has the court found, a single case in which a

plaintiff brought a First Amendment retaliation claim in such circumstances, let alone one in

which such a claim was found plausible.[96] It is not difficult to surmise why that is the case. Why

---

[95] *See id.* ¶¶ 110–13, 138–49.

[96] Typically, retaliatory acts that give rise to a First Amendment retaliation claim occur outside the scope of the plaintiff's petition for redress. *See, e.g.*, *Van Deelen*, 497 F.3d at 1157–59 (finding a genuine dispute as to whether a plaintiff had suffered First Amendment retaliation when county commissioners and officials threatened and intimidated the plaintiff into dropping tax assessment challenges). The only circumstance where retaliatory acts within the scope of the plaintiff's petition for redress constitute First Amendment retaliation of which this court is aware is when the government brings a retaliatory counterclaim in the action constituting the petition for redress. *See Dear v. Nair*, No. 21-2124, 2022 WL 2165927, at *5 (10th Cir. June 16, 2022) (holding that the assertion of a civil counterclaim seeking monetary and punitive damages in the action constituting a plaintiff's petition for redress could constitute a retaliatory act for purposes of a First Amendment retaliation claim). However, that is not necessarily the case if the counterclaim seeks only declaratory relief. *See id.* (distinguishing the counterclaim in *Dear* with the circumstances in *Shero*, in which the court held that an action against a plaintiff who exercised First Amendment rights seeking only declaratory relief did not constitute First Amendment retaliation).

would the continued threat or occurrence of the very injury a plaintiff sought to prevent or remedy by exercising his or her right to petition the government for redress chill a plaintiff of ordinary firmness from continuing to exercise that right?[97] It is not plausible that the very circumstances that spur a plaintiff to exercise First Amendment rights would somehow later deter the plaintiff from continuing to do so simply because those circumstances remain after a lawsuit is commenced.

Additionally, the allegation that Defendants' actions have had a chilling effect on some plaintiffs in this lawsuit is not supported by the allegations Plaintiffs have made. Keith Christian, the individual who Plaintiffs allege was chilled from further participation in this lawsuit, did not say that it was Defendant's decision to "withhold lease renewals from any persons named in this action" that led him to withdraw from it. It was the fact that his lease had expired, and that the Airport was willing to grant him a new lease with a 13-year term if he was no longer a plaintiff in this lawsuit, that led him to "feel it [was in his] best interest to withdraw from participation in the" lawsuit.[98] The Airport's offer to give Christian a new 13-year lease if he abandoned his claims in this lawsuit was therefore essentially a settlement offer, not an act of deterrence or intimidation.[99] Christian could have rejected the offer and continued to seek relief based on the claims Plaintiffs assert here: that their Agreements—or Defendants' historical representations and course of conduct—give them the right to request and receive an additional five-year lease term whenever their lease term expires, regardless of whether it is the original term or a previous extension. However, after considering his options, Christian concluded that it was in his best

---

[97] Defendants' refusal to renew the leases of those named as Plaintiffs in this lawsuit is even less likely to have a deterrent effect on those who had already lost their hangars by the time the amended complaint was filed.

[98] ECF Nos. 57 ¶ 148; 57-10.

[99] The record does not contain any details about Christian's new lease, including what type of lease it was, other than the fact that it was for a 13-year term.

interest to take the Airport's offer rather than seek perpetual lease renewals or compensation through this lawsuit.

Thus, it does not appear that Christian was deterred from continuing to seek redress through this lawsuit, only that he found the remedy offered by the Airport preferable to doing so. That does not make the Airport's actions retaliatory. Nor does it give rise to a reasonable inference that such actions would deter a person of ordinary firmness from exercising his or her First Amendment right to petition for redress.[100] At most, it may lead some individuals to conclude that another route is preferable, as was the case with Christian.[101]

Accordingly, because Plaintiffs have failed to plausibly allege both that Defendants' actions were substantially motivated by Plaintiffs' bringing this lawsuit and that such actions would chill a person of ordinary firmness from continuing to pursue his or her First Amendment rights, Plaintiffs' First Amendment retaliation claim must be dismissed.

### C.  The Absence of Federal Question Jurisdiction Warrants the Dismissal of Plaintiffs' Claims under the Declaratory Judgment Act and State law.

As discussed above, the court has jurisdiction to provide declaratory relief pursuant to the Declaratory Judgment Act only if there is "some independent basis of jurisdiction" for doing so.[102] Because all of Plaintiffs' federal claims have been dismissed, and there appears to be no basis for exercising diversity jurisdiction because most, if not all, parties reside in Utah, the court

---

[100] The same is true of Defendants' statement to another Plaintiff who submitted a notice of renewal, "You can seek the possibility of a new lease through the Airport, or you can choose to join litigation against the City to seek something different through the courts."

[101] That being said, there could be grounds for a First Amendment retaliation claim if Defendants declined to give equal consideration to Plaintiffs seeking the new types of leases being offered as they would to any other member of the public merely because Plaintiffs brought this lawsuit. However, that is not what Plaintiffs have alleged here.

[102] *Cardtoons*, 95 F.3d at 964.

does not have jurisdiction to provide the declaratory relief Plaintiffs seek. Therefore, Plaintiffs

claims under the Declaratory Judgment Act must be dismissed.

Additionally, because all claims over which the court has original jurisdiction—Plaintiffs'

federal claims—have been dismissed, the court must determine whether to exercise jurisdiction

over the remaining state law claims.[103] The Tenth Circuit Court of Appeals has long instructed

that "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to

exercise jurisdiction over any remaining state claims."[104] Based on this instruction, and because

this lawsuit involves only Utah-based parties and claims under Utah law, it is most appropriate

for Plaintiffs' remaining state law claims to be resolved in the courts of Utah. Therefore, the

court declines to exercise jurisdiction over Plaintiffs' remaining state law claims and dismisses

them without prejudice.

## ORDER

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. Plaintiffs'

federal claims are DISMISSED WITH PREJUDICE for failure to state a claim for which relief

can be granted. Plaintiffs' state law claims are DISMISSED WITHOUT PREJUDICE under 28

U.S.C. § 1367(c)(3).

DATED July 11, 2022.

BY THE COURT

David Barlow
United States District Judge

---

[103] *See* 28 U.S.C. § 1367(c)(3).

[104] *Smith v. City of Enid By & Through Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998).